Sarah E. COLES, By Her Next Friend, Elizabeth Lashley COLES, Plaintiff (97–3104), Plaintiff–Appellant (97–3082),

Gene T. Tracey, Plaintiff–Appellant (97–3104),

v.

CLEVELAND BOARD OF EDUCATION, et al., Defendants–Appellees.

Nos. 97–3082, 97–3104.

United States Court of Appeals, Sixth Circuit.

June 11, 1999.

Before: RYAN, COLE, and GILMAN, Circuit Judges.

## ORDER

The court having received a petition for rehearing en banc, and the petition having been circulated not only to the original panel members but also to all other active judges of this court, and less than a majority of the judges having favored the suggestion, the petition for rehearing has been referred to the original panel.

The panel has further reviewed the petition for rehearing and concludes that the issues raised in the petition were fully considered upon the original submission

and decision of the case. Accordingly, the petition is denied.

RYAN, Circuit Judge, dissenting.

I dissent from the court's order denying rehearing *en banc* for the reasons stated in my opinion dissenting from the opinion and judgment of the panel in this case.

BOGGS, Circuit Judge, dissenting from the denial of rehearing en banc, joined by Judges·DAVID A. NELSON, ALAN E. NORRIS, SUHRHEINRICH, SILER and BATCHELDER.

The panel's opinion, which the failure of the court to grant rehearing en banc allows to stand, represents a radical departure from Supreme Court precedent on the permissibility of prayer and solemnization at the beginning of governmental functions. In its concept, it also represents a challenge to the freedom of speech of elected legislators. I therefore respectfully dissent from our court's refusal to consider the matter further.

Judge Ryan's dissent from the panel opinion ably sets forth the Supreme Court's precedents, flowing from *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), which recognize the role of solemnization in the inception of the meetings of a deliberative body, even in the form of prayers that call upon one or another form of deity satisfactory to members of that body. The panel majority's attempt to carve out an exception for bodies that deal with educational subjects is unconvincing. This is especially so in light of the large proportion of the attention of general legislative bodies that is consumed with the subject of education.

I write separately, however, to call attention to the implication of the panel majority's determined drive to erase the possibility of any inclusion of a request for divine guidance in the solemnization of at least this species of public meeting.

Presumably the panel majority would have no objection if the School Board choose to get themselves in the right frame of mind to deliberate by doing yoga, or taking deep breathing exercises. I'm sure it would be all right if they decided to read passages from a self-help book on effective meetings. And if they were to choose to commence meetings by having each publicly elected official, on a rotational schedule, read from some work of inspiration chosen by the member, such as Emerson's "Self–Reliance," Theodore Roosevelt's "The Man in the Arena," the latest work by Oprah Winfrey, or the collected wisdom of Barney, there could be no objection. But what a crabbed view of the nature of humanity is implied by the notion that the Constitution would forbid one of the members to choose to express inspiration from the Torah, Koran or Book of Common Prayer!

Two objections may be raised to my comparison. One, that there is no constitutional bar to establishing Emerson, only to establishing religion. Second, that in my example, the choice of expression is made by each legislator individually rather than by its chairman, at the suffrance of his colleagues, as appears to be the case from this record.

The first objection fails, however, where the religious expression is made in a manner that is merely equivalent to other modes of solemnization. Cases such as *Rosenberger v. Rector and Visitors of the University of Va.*, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995), *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993), and *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), have shown that the religion clauses of the First Amendment do not mean that religious expression must be treated worse than other types of expression.

The second objection leaves its makers on the horns of a dilemma. If they seriously are concerned about the evils per-

ceived by the majority in the practice of the Cleveland School Board, every one of those evils would still persist in my proposed system. Those who are simply appalled by religious expression at a governmental gathering would still suffer; those who feel excluded by the knowledge that some of their elected officials take guidance from a different source than their own will still be forced to bear that knowledge, if they choose to attend every second of the meeting; and so on. Thus, if they are serious about suppressing those perceived evils, they must believe that the Constitution allows Marx but not Moses, Oprah but not Obadiah, and Emerson but not Ephesians, and the majesty of the federal courts must suppress the individual speech of legislators when it strays over the line.

Alternatively, if the majority and their supporters believe that it makes all the difference whether the solemnization is accomplished by the collective action of the board rather than by simply permitting individual and equal choice of the members, and thus would find no objection to my proposed alternative, they show just how thin is the distinction made. In fact, in most legislatures, choice of the person to give opening prayers is in fact frequently done in a manner similar to my hypothesis; individual members generally have the opportunity to invite a speaker of their choice on some distributional basis, perhaps with an institutional chaplain as a backstop. *See, e.g.,* 145 Cong. Rec. H3698 (daily ed. May 27, 1999); 145 Cong. Rec. S5889 (daily ed. May 25, 1999); 145 Cong. Rec. S5633 (daily ed. May 20, 1999); 145 Cong. Rec. S4405 (daily ed. April 29, 1999); 145 Cong. Rec. S3889 (daily ed. April 20, 1999); 145 Cong. Rec. S3027 (daily ed. March 22, 1999); and especially 145 Cong. Rec. S1971 (daily ed. Feb. 25, 1999).

If my suggested alternative is in fact constitutional, I see little reason to doubt that it might well be adopted by Boards such as Cleveland's, and the supposed bedrock constitutional principle announced by the majority would have amounted to almost nothing in the vast majority of instances.

For me, the function of solemnization, whether performed in Congress, at Presidential Inaugurations, or even in school boards, is one that does not constitute the establishment of a religion.

In arenas where philosophy, morals, and values are necessarily salient, that is to say in the actions of those who are empowered to rule over us by force, religious expression should not be forced to take a back seat to other sources of guidance.

I thus dissent from our failure to address these issues further by undertaking to rehear this case en banc.

MERRITT, Circuit Judge, concurring in the denial of rehearing en banc, joined by Chief Circuit Judge BOYCE F. MARTIN, Jr.

The language of my colleagues dissenting from the en banc vote in this case is colorful—especially the rhetoric about beginning school board meetings "doing yoga" or "deep breathing exercises" or readings from Oprah Winfrey or the "wisdom of Barney." Some of the "how-now-brown-cow" alliteration is interesting—for example, the statement that those not voting for the en banc "must believe that the Constitution allows Marx but not Moses, Oprah but nor Obediah, and Emerson but not Ephesians."

Unfortunately, these amusing rhetorical devices do not mention that what we have here is a sectarian Christian minister as school board president not only calling for the congregation to pray to his sectarian "Lord," his New Testament "Lord" but also to do so "in Jesus' name." The rhetoric of my colleagues has broad appeal to many religious and political groups, but it has not appealed to the Supreme Court or this court in the past.

My dissenting friends would allow, as they say quite explicitly in the second paragraph, sectarian "prayers that call

upon one or another form of deity satisfactory to members of that body." This, of course, would allow Catholic prayers to the Virgin Mary where the majority is Catholic and can enforce its will, or "fire and brimstone" prayers where the majority is Fundamentalist, or Jewish prayers in Hebrew where the majority of the community is of the Jewish faith.

It does not appeal to the American sense of fair play required by the Establishment Clause as elaborated in *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), for as our Court said some years ago in *Stein v. Plainwell Community Schools*, 822 F.2d 1406 (6th Cir. 1987), in striking down similar sectarian prayers at commencement exercises:

> From the beginning of the colonial period to the present, American churches have taken their various religious differences seriously, and under the Free Exercise and Establishment clauses taken together, we have generally accepted and settled on an accommodation: The concept of the equal liberty of conscience is our guiding principle. In our national and community life, we can never be sure whether our particular religious, sectarian and moral convictions will be in the majority or the minority. So, as a diverse people we have rejected the notion of a confessional state that supports religion in favor of a neutral state designed to foster the most extensive liberty of conscience compatible with a similar or equal liberty for others. To those who act or argue against this principle of equal liberty of conscience on grounds that their duty is to use the state in support of their particular beliefs, we answer that we cannot expect others to accept an inferior liberty. To those who say that the principle of equal liberty of conscience has the effect of rejecting the absolute nature of their religious beliefs, we reply that if any principle can be agreed to, it can only be that of an equal liberty of conscience for all.

In *Marsh v. Chambers*, the Supreme Court, looking primarily to the intent of the framers of the Constitution and historical practice since 1789, *id.* at 786–792, 103 S.Ct. 3330, upheld "nonsectarian," *id.* at 793 n. 14, 103 S.Ct. 3330, "nonproselytizing" legislative invocations that do not "symbolically place the government's official seal of approval on one religious view," *id.* at 792, 103 S.Ct. 3330 (citation omitted). The Court emphasized that "civil" or secularized invocations are used across the country to open legislative, judicial, and administrative sessions of state legislatures, city councils, courts and other public bodies, as well as by private institutions of all kinds. So long as the invocation or benediction on these public occasions does not go beyond "the American civil religion," so long as it preserves the substance of the principle of equal liberty of conscience, no violation of the Establishment Clause occurs under the reasoning of *Marsh*. *Id.* at 793 n. 14, 103 S.Ct. 3330.

The annual graduation exercises here are analogous to the legislative and judicial sessions referred to in *Marsh* and should be governed by the same principles. The invocation and benediction at a graduation ceremony serves the "solemnizing" function described by Justice O'CONNOR in her concurrence in *Lynch v. Donnelly:*

> Such governmental "acknowledgments" of religion as legislative prayers of the type approved in *Marsh v. Chambers*, government declaration of Thanksgiving as a public holiday, printing of "In God We Trust" on coins, and opening court sessions with "God save the United States and this honorable court" ... serve the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worth of appreciation in society.

465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring) (citation omitted).

Like federal, state and local legislative and court sessions throughout the country, there are thousands of public graduation exercises annually. They are frequently memorable occasions for students, parents and friends. To prohibit entirely the tradition of invocations at graduation exercises while sanctioning the tradition of invocations for judges, legislators and public officials does not appear to be a consistent application of the principle of equal liberty of conscience.

At the same time, the invocations and benedictions delivered at these occasions should not be framed in language that is unacceptable under *Marsh*, language that says to some parents and students: we do not recognize your religious beliefs, our beliefs are superior to yours. The invocations and benedictions delivered here do not pass the *Marsh* test. They are framed and phrased so that they "symbolically place the government's seal of approval on one religious view"—the Christian view. They employ the language of Christian theology and prayer. Some expressly invoke the name of Jesus as the Savior. They are not the "civil" invocations or benedictions used in public legislative and judicial sessions as described in *Marsh*.

What we have before us in the instant case from Cleveland are similar sectarian prayers that "invoke the name of Jesus as the Savior." Despite the amusing rhetoric of my dissenting friends about "yoga," etc., I doubt that the chairman of the Cleveland School Board would want to substitute yoga, breathing exercises, Oprah, Barney or Emerson because he is interested in invoking the name of Jesus as our Savior.

I do not mean in any way to denigrate the religious views of the Cleveland School Board President who is a Christian minister. I have been baptized in this same faith for more than 60 years and bow my head in reverence to the Christian faith and the teachings of Jesus. But I do not believe as a judge that I may constitutionally call upon those attending my court to repeat the Lord's Prayer or participate in any other prayer in which I ask them to accept Jesus as their Savior. Thank God that the Establishment Clause forbids me from doing that whenever I may be tempted to do so, just as it forbids the Cleveland School Board Chairman from worshiping his Savior in sessions over which he presides. Invoking Jesus as the Savior, or any other sectarian form of prayer, is no more appropriate in opening school board meetings than it would be in opening a session of the Sixth Circuit Court of Appeals.